In the

# United States Court of Appeals
## For the Seventh Circuit

———————

No. 05-4592

LINDA CALL, on behalf of herself and
all others similarly situated,

*Plaintiff-Appellee*,

*v.*

AMERITECH MANAGEMENT PENSION PLAN,

*Defendant-Appellant*.

———————

Appeal from the United States District Court
for the Southern District of Illinois.
No. 01-717-GPM—**G. Patrick Murphy**, *Chief Judge*.

———————

ARGUED NOVEMBER 30, 2006—DECIDED JANUARY 9, 2007

———————

Before POSNER, KANNE, and EVANS, *Circuit Judges*.

POSNER, *Circuit Judge*. We'll have to sketch some background to make this ERISA controversy, which resulted in an award of damages to the plaintiff class of more than $31 million, minimally intelligible.

When a participant in a defined-benefit pension plan is given a choice between taking pension benefits as an annuity or in a lump sum, the lump sum must be so calculated as to be the actuarial equivalent of the annuity. ERISA § 204(c), 29 U.S.C. § 1054(c); *Stephens v. Retirement*

*Income Plan for Pilots of U.S. Air, Inc.*, 464 F.3d 606, 614 (6th Cir. 2006); *Esden v. Bank of Boston*, 229 F.3d 154 (2d Cir. 2000). To achieve this equivalence requires determining the pensioner's life expectancy from a mortality table and then applying a discount rate to the annuity payments that the participant would receive each year until his expected year of death (per the mortality table) if he chose to take his retirement benefits as an annuity rather than as a lump sum. The discount rate converts the stream of expected future payments into a present value, which is the amount of the lump sum. The longer a person's life expectancy, the greater the value of an annuity to him (because it will be received, on average, for more years) and hence the larger the actuarially equivalent lump sum will be as well, since it is merely the discounted present value of the annuity. But the higher the discount rate, the lower the value of the annuity and hence the smaller the lump sum. A higher discount rate, as the term "discount" implies, reduces the value of future receipts (they are "discounted" more) and hence the present value of those receipts, which is the lump sum. Thus the discount rate and the mortality table jointly determine the lump-sum equivalent of the annuity to which the pension plan entitles the plan participant.

Until 1993, the Ameritech Management Pension Plan, in calculating these lump sums, used (1) a required discount rate fixed by the Pension Benefit Guaranty Corporation that we shall call the "PBGC" rate, and (2) an optional mortality table called Unisex Pensions-1984 (UP84). See "Notice of Intent to Propose Rulemaking: Lump Sum Payment Assumptions," 63 Fed. Reg. 57228-29 (Oct. 26, 1998). In that year the Pension Benefit Guaranty Corporation adopted a new mortality table, the 1983 Group Annu-

ity Mortality Table (83GAM), which specified longer life expectancies than UP84 but only for annuities, not for lump sums. To prevent the change in mortality tables from increasing the cost of pension plans, the Corporation coupled the new mortality table with a new, higher discount rate—the 30-year Treasury Bill interest rate, called "GATT" (because adopted pursuant to the General Agreement on Tarrifs and Trade). The relevance of discount rates to annuities is that the higher the discount rate, the lower the cost to the pension plan of funding an annuity.

The Corporation did not want to apply the new discount rate to lump sums because, at the time, ERISA required pension plans to use whatever discount rate the Corporation selected. 29 U.S.C. § 1055(g) (1988). So, since the mortality table was not prescribed, the new GATT rate would be coupled in many plans with the old UP84 table, a coupling that would generate windfalls to plans at the expense of participants because, as we know, the higher the discount rate, the smaller the lump sum. So the Corporation decided that pending legislative action that would either free plans from the Corporation's mandatory new discount rate or require them to adopt the new mortality table as well, it would publish two different combinations of discount rate and mortality table: GATT-83GAM for annuities and PBGC-UP84 for lump sums (though plans could use a different mortality table if they wanted to). "Notice of Intent to Propose Rulemaking: Lump Sum Payment Assumptions," *supra*; "Valuation of Plan Benefits in Single-Employer Plans; Valuation of Plan Benefits and Plan Assets Following Mass Withdrawal," 58 Fed. Reg. 5128-32 (Jan. 19, 1993).

The following year (1994), the Ameritech Management Pension Plan amended its plan in an effort to make clear

that lump sums would still be calculated using the old mortality table, UP84, and, as required, the old, PBGC discount rate, since the new, higher rate was applicable only to annuities. The reason the Plan needed to make explicit that PGBC-UP84 would be the method of calculating lump sums for plan participants was that the existing plan required that lump sums be calculated using the discount rate and life expectancies used by the Pension Benefit Guaranty Corporation to value *annuities*. So when the Corporation adopted a new discount rate and mortality table for annuities, the adoption would automatically alter the plan's method of computing lump sums unless the plan was amended.

Unfortunately for the Ameritech Management Pension Plan, the 1994 amendment changed only the plan provision specifying the discount rate, implying, at least on a literal reading, that the value of lump sums would be determined by the old discount rate (PBGC) but by the new annuity mortality table (83GAM). A district court (in fact the same judge as in this case) held that by failing to delete the references to annuities in the provision relating to the mortality table, the plan was stuck with using the Corporation's new mortality table for annuities to calculate the plan's lump sums. *Malloy v. Ameritech Management Pension Plan*, No. 98-488-GPM, 2000 U.S. Dist. LEXIS 20490 (S.D. Ill. Feb. 7, 2000). The Ameritech Plan did not appeal the *Malloy* decision, but instead accepted that the awkward combination of PBGC (low discount rate) with 83GAM (long life expectancies) was now the formula for determining plan participants' lump-sum entitlements, and that ERISA's anti-cutback provision (of which more anon), 29 U.S.C. § 1054(g), clicked in, preventing the Plan from unilaterally withdrawing the windfall that the botched

amendment and the *Malloy* decision had conferred on plan participants.

The same year as that amendment to the plan, Congress passed the Retirement Protection Act of 1994, Pub. L. No. 103-465, 108 Stat. 4809, which required that lump-sum equivalents of defined-benefit annuities equal or exceed lump sums calculated by combining GATT for the discount rate with 83GAM for the life expectancies. These changes could produce a bigger or a smaller lump sum than under the previous life expectancies (UP84) and discount rate (PBGC), because while the new mortality table lengthened the life expectancies, the new method of computing the discount rate increased that rate, and we know that a longer life expectancy pushes the lump sum up but a higher discount rate pushes it down. ERISA's anti-cutback provision forbids amending a plan to reduce accrued benefits, but the Retirement Protection Act provided that amendments that adopted the GATT-83GAM methodology for calculating lump sums would not violate the provision.

Pension plans were given six years to comply with the new Act. In 1995, the year after the Act took effect, the Ameritech Management Pension Plan, seeking to take advantage of the grace period, reinstated UP84, the mortality table with the shorter life expectancies. The thinking was that since pensioners would be favored by the obsolete low discount rate, PBGC (because the Plan was not yet adopting GATT—it had until the last day of 1999 to do so), they should not also be favored by the long life expectancies in 83GAM. But the amendment, like its predecessor, was a botch. For remember that the Retirement Protection Act required plans either to adopt GATT-83GAM or retain the status quo, and the status quo for the Ameritech

Plan was, by virtue of the unappealed decision in *Malloy* that had construed the plan as previously amended, PBGC-83GAM. By reinstating UP84, the table with the short life expectancies (hence disadvantageous to pensioners), the 1995 amendment reduced the status quo benefits. And since it was not implementing the Retirement Protection Act by adopting GATT-83GAM, the amendment failed to qualify for the exemption from ERISA's anti-cutback provision.

Curiously, the Plan had not relied on the 1995 amendment in the *Malloy* litigation, even though that suit was filed in 1998. In the present case, the Plan argues that the 1995 amendment carries the day. It does not. Invoked to reduce benefits, it violates the anti-cutback provision, as just explained.

The defendant tried again in 1999. An "Eleventh Amendment" to the plan provided that lump-sum distributions to people in the plaintiff's position would be valued at the higher of either the amount produced by using the PBGC-UP84 actuarial assumptions or the amount produced by using the GATT-83GAM assumptions. The amounts are actually quite similar, but the amendment brought the plan into compliance with the Retirement Protection Act and so avoided ERISA's anti-cutback rule. The plaintiff wants to invalidate the Eleventh Amendment because she would do even better under PBGC-83GAM—the "juicy" method, ordained in *Malloy*, that combines a lower discount rate with a longer life expectancy. The district court agreed, and granted summary judgment in favor of the plaintiff.

The validity of the Eleventh Amendment turns on section 12.1 of the plan, which provides that "no amendment will reduce a Participant's accrued benefit to less than the

accrued benefit that he would have been entitled to receive if he had resigned [from Ameritech] on the day of the amendment . . . and no amendment will eliminate an optional form of benefit with respect to a Participant or Beneficiary except as otherwise permitted by law and applicable regulations." Had the plaintiff retired on the day of the amendment, she would have received a lump sum calculated according to PBGC-83GAM. But she retired several months later, and the Plan insists that she is not entitled to a lump sum so calculated because it is not an "accrued benefit."

The defendant does not argue that it could simply amend section 12.1 to delete the "no amendment" provision. That would be like orally amending a contract providing for no oral amendments, which the common law allowed on the "theory" that an oral amendment would first amend the no-amendment clause and then amend the substance. *Wisconsin Knife Works v. National Metal Crafters*, 781 F.2d 1280, 1286 (7th Cir. 1986). The Uniform Commercial Code abrogated the common law rule for contracts governed by the Code. *Id*.; UCC § 2-209(2). That rule is equally ill-adapted to an ERISA case. Unlike the case of an ordinary contract, plan administrators generally have the right to amend pension plans unilaterally, *Curtiss-Wright Corp. v. Schoonejongen*, 514 U.S. 73 (1995), subject to procedural requirements, the statutory anti-cutback rule and other statutory provisions, and vesting rules. Section 12.1 is designed to prevent cutbacks by amendment that are not covered by the statutory anti-cutback rule. If the Plan could unilaterally eliminate the private anti-cutback provision by amendment, section 12.1 would be empty.

The section does not define "accrued benefit," however; and while there is a definition elsewhere in the plan, it

does not govern this section. The plan specifies that only definitions in capital letters apply to sections other than the one in which the definition appears, and the definition of "accrued benefit" neither appears in section 12.1 nor is in capital letters. The term appears in ERISA's anti-cutback provision, however, and since the Eleventh Amendment is a private anti-cutback provision, the parties naturally have referred us to the use of the term in the statute. The Plan would prefer us to look no further than 29 U.S.C. § 1002(23)(A), which defines "accrued benefit" as "the individual's accrued benefit determined under the plan . . . expressed in the form of an annual benefit commencing at normal retirement age," which for Call would have been 65. But she took early retirement, and ERISA's anti-cutback provision forbids both decreasing "accrued benefits" (presumably as defined in section 1002(23)(A)) and "eliminating or reducing an early retirement benefit . . . attributable to service before the [plan] amendment." 29 U.S.C. § 1054(g). Any such elimination or reduction "shall be treated as reducing accrued benefits." *Id*.

An "optional form of benefit" is defined neither in ERISA nor in the Ameritech plan, and its meaning is obscure. But it is not an "early-retirement benefit," a term that fits the plaintiff's claim to a T. As *Ross v. Pension Plan for Hourly Employees of SKF Industries, Inc.*, 847 F.2d 329, 333 (6th Cir. 1988), explains, "Early retirement benefits are generally benefits that become available upon retirement at or after a specified age which is below the normal retirement age, and/or upon completion of a specified period of service. An optional form of benefit is generally one that involves the power or right of an employee to choose the way in which payments due to him under a

plan will be made or applied." An entitlement to take one's pension benefits as a lump sum at normal retirement age is an example of an optional form of benefit.

For purposes of the statutory anti-cutback provision, then, early-retirement benefits are treated as accrued benefits that may not be reduced; and the district court, granting summary judgment for the plaintiff, ruled that section 12.1 should be interpreted the same way. The defendant insists, however, that only a pension in the form of an annuity starting at normal retirement age is an "accrued benefit" within the meaning of section 12.1, and that an accrued benefit must be distinguished from the actuarial assumptions used to determine lump-sum benefits.

But the separate treatment of "optional form of benefit" in section 12.1 implies that "early-retirement benefits" are accrued benefits within the meaning of the first clause and therefore that only an optional form of benefit can be withdrawn if the law permits, not an early-retirement benefit. Had the defendant wanted to subject early-retirement benefits to the same rule, the plan would say something like "no amendment will eliminate an early-retirement or optional form of benefit with respect to a Participant or Beneficiary except as otherwise permitted by law and applicable regulations," rather than putting "except as otherwise permitted" in a separate clause referring to optional forms of benefit.

If this "literal" interpretation affronted the common sense of, or the economic realities behind, section 12.1, that would be a powerful reason to reject it. *Beanstalk Group, Inc. v. AM General Corp.*, 283 F.3d 856, 860 (7th Cir. 2002); *Kerin v. U.S. Postal Service*, 116 F.3d 988, 991 (2d Cir. 1997); *New Castle County v. Hartford Accident & Indemnity*

*Co.*, 970 F.2d 1267, 1270 (3d Cir. 1992). "There is a long tradition in contract law of reading contracts sensibly." *Rhode Island Charities Trust v. Engelhard Corp.*, 267 F.3d 3, 7 (1st Cir. 2001). But it is the defendant's interpretation that lacks the appeal of common sense. It denies any force to section 12.1 as a private anti-cutback rule (which is all it is), because its interpretation would leave participants with no more protection than the statutory anti-cutback rule would give them, making the section superfluous. Acknowledging this point in effect, the defendant argues that it was legally obligated to state its statutory obligations in the plan. But that is nonsense; section 12.1 did not even appear in earlier versions of the plan; nor does the section accurately state the defendant's statutory obligations. In contrast, the plaintiff's interpretation preserves early-retirement benefits by contract in situations in which ERISA would permit them to be curtailed.

Companies encourage early retirement in order to make room for "fresh blood." Had Ameritech told the plaintiff that by retiring early she would lose a benefit worth almost $36,000 (the difference between a PBGC-UP84 pension and the PBGC-83GAM pension to which she claims to be entitled)—a substantial percentage of her pension entitlement (14 percent)—she might have decided to remain with the company until the normal retirement age. This is a practical reason for invoking the principle that ambiguities in a contract that remain after extrinsic evidence has been presented (which neither party wishes to do in this case) are resolved against the party who drafted the contract, e.g., *Shelby County State Bank v. Van Diest Supply Co.*, 303 F.3d 832, 838 (7th Cir. 2002), unless both parties are commercial enterprises. *Beanstalk Group, Inc. v. AM General Corp., supra*, 283 F.3d at 858; and

cases cited there; *Dawn Equipment Co. v. Micro-Trak Systems, Inc.*, 186 F.3d 981, 989 n. 3 (7th Cir. 1999).

Now just because the statutory anti-cutback provision makes no distinction between normal retirement benefits and early-retirement benefits is no reason for the Ameritech plan to do the same thing. But as we have just seen, the defendant offers no reason for thinking that the distinction makes any more sense in section 12.1 than it does in ERISA's anti-cutback provision. If the Plan sought to deprive the plaintiff and similarly situated employees of the windfall created by the *Malloy* decision, which it could have done without violating the statutory anti-cutback rule because that rule is inapplicable to plans adopting the GATT-83GAM assumptions, why didn't it include language in section 12.1 to that effect?

It is true that the plan administrator, who is given discretion to interpret the plan, adopted the interpretation that the defendant is urging upon us; to reject his interpretation we must find an abuse of that discretion. But "we have said many times that the term 'abuse of discretion' covers a range of degrees of deference rather than denoting a point within that range, and where a particular case falls in the range depends on the precise character of the ruling being reviewed." *Schering Corp. v. Illinois Antibiotics Co.*, 62 F.3d 903, 908 (7th Cir. 1995) (citations omitted); cf. *Manny v. Central States, Southeast & Southwest Areas Pension & Health & Welfare Funds*, 388 F.3d 241, 242-43 (7th Cir. 2004). The deference that we would normally give to an interpretation by the administrator of a pension plan, *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 110-11 (1989); *Herman v. Central States, Southeast & Southwest Areas Pension Fund*, 423 F.3d 684, 692-93 (7th Cir. 2005), is overridden in this case by the lack of any reasoned basis for that

interpretation. *Mers v. Marriott International Group Acciden-tal Death & Dismemberment Plan*, 144 F.3d 1014, 1021 (7th Cir. 1998); *Swaback v. American Information Technologies Corp*. 103 F.3d 535 (7th Cir. 1996).

Deference is relative to the nature of the issues, including their complexity. *Carr v. Gates Health Care Plan*, 195 F.3d 292, 295 (7th Cir. 1999); *Cozzie v. Metropolitan Life Ins. Co.*, 140 F.3d 1104, 1108-09 (7th Cir. 1998). The more com-plex, the greater the range of reasonable resolutions. In addition, "Deference depends on ambiguity." *Contract Courier Services, Inc. v. Research & Special Programs Adminis-tration*, 924 F.2d 112, 115 (7th Cir. 1991). The points are related. The more numerous and imponderable the factors bearing on a decision, the harder it will be for a reviewing court to pronounce the decision unreasonable and hence an abuse of discretion. But the interpretation of written contracts in cases in which no extrinsic evidence (that is, no evidence—besides the contract itself) is pre-sented is usually pretty straightforward. There are the contract's wording, some commonsensical principles of interpretation, and the commercial or other background of the contract insofar as that can be gleaned without taking evidence. When guides to meaning line up on one side of the case, as they do here, an adjudicator who decides the case the other way is likely to be acting unreasonably. Just as unambiguous terms of a statute leave no room for the agency that administers the statute to exercise interpretive discretion, *National Cable & Telecommunications Ass'n v. Brand X Internet Services*, 125 S. Ct. 2688, 2700 (2005), so unambiguous terms of a pension plan leave no room for the exercise of interpretive discretion by the plan's admin-istrator, or at least not enough to carry the day for the administrator in this case. And while a contract or other

instrument that looks unambiguous to the uninformed reader may be shown to be ambiguous when the context of the instrument is explained, *Confold Pacific, Inc. v. Polaris Industries, Inc.*, 433 F.3d 952, 955-56 (7th Cir. 2006), the Ameritech Management Pension Plan has presented no such evidence of a latent ambiguity.

The Plan's remaining arguments are makeweights, perfunctorily argued. The judgment of the district court is

AFFIRMED.

A true Copy:

Teste:

_____

*Clerk of the United States Court of Appeals for the Seventh Circuit*