In the

# United States Court of Appeals
## For the Seventh Circuit

No. 10-3287

KENNETH A. CARTER, et al.,

*Plaintiffs-Appellants*,

*v.*

PENSION PLAN OF A. FINKL & SONS COMPANY
FOR ELIGIBLE OFFICE EMPLOYEES, et al.,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 08 CV 7169—**Rebecca R. Pallmeyer**, *Judge.*

ARGUED MAY 5, 2011—DECIDED AUGUST 15, 2011

Before MANION, WOOD, and WILLIAMS, *Circuit Judges.*

MANION, *Circuit Judge.* When a qualified pension plan decides to terminate, it must follow a careful and exacting process that ends with the plan purchasing annuities for all its beneficiaries from a third-party private insurance company. The A. Finkl & Sons Pension Plan decided to voluntarily terminate, but after going through some extensive initial steps, it realized that it would be too

expensive and formally withdrew from the process. At the heart of its decision was an amendment to the Plan that provided that if the Plan terminated, the employees could keep working at Finkl while still receiving the annuities that Finkl purchased for them. The costs associated with this benefit were far more than Finkl anticipated.

After Finkl notified its employees and the government agency that it had decided not to terminate the Plan, a group of Finkl employees sued. They claimed that the Plan had taken away some of their protected rights, rights that are guaranteed under the Employment Retirement Income Security Act of 1974, 29 U.S.C. §§ 1001, *et seq.* and under the Plan's own provisions. Under the Act and Finkl's own Plan, some benefits are protected from amendment—that is, certain benefits once given cannot be taken away or decreased. This is commonly referred to as the anti-cutback provision or anti-cutback clause, depending on whether it is contained in the Act or the plan's own terms.

Plaintiffs argued that their ability to receive an annuity while still working at Finkl was protected both by the Act and under the language of Finkl's Plan. The Plan protects beneficiaries from amendments that decrease "accrued benefits." Plaintiffs recognized that the amendment gave them the right to receive an annuity while still working only if the Plan terminated. Thus, they claim that the Plan had in fact terminated and their right to the annuity while still working had accrued.

The district court found that plaintiffs' ability to receive an annuity while still working is not a protected right

under either the Act or the Plan's own terms. The Act only protects certain benefits, and those relevant here are all tied to benefits available at retirement. The district court also found that plaintiffs' ability to receive an annuity while still working was contingent on the Plan terminating. Despite plaintiffs' argument to the contrary, the Plan never terminated—it was in the process of terminating but quickly withdrew from the process prescribed by the Act and the governing regulations when it discovered the unexpected financial impact.

Plaintiffs now appeal and we affirm. The district court was correct that plaintiffs' right to an immediate annuity while still working at Finkl was not a right protected by the Act. Further, the plaintiffs would only have an accrued and thus protected benefit under the Act if the Plan terminated, and the Plan did not terminate. Instead, it withdrew from the process before it was completed. Thus, plaintiffs do not have an accrued right that was protected from amendment.

## A. Background

Finkl is a large steel company based in Chicago. Among the benefits it offers employees is a defined benefit pension plan that qualifies under the Employment Retirement Income Security Act of 1974, 29 U.S.C. § 1001, *et seq*. At some point in 2006, Finkl decided to terminate its Plan. [Tab 1]. The record isn't completely clear why, but it seems that Finkl anticipated merging with another company; apparently, the outstanding liability that attached to the Plan was a stumbling block. So in hopes

of moving forward with the merger, Finkl decided to terminate the Plan. [Tab 2-3]. Although Finkl and its Plan are separate legal entities, for clarity's sake we sometimes refer to them as one.

1.  Plan Termination Process

Under the Act, a plan may only terminate after an involved process. Depending on how you count the steps there are over thirteen with many, many regulations to follow. First, there must be sufficient assets to cover the plan's liabilities—the benefits promised to its beneficiaries, namely the employees. Then, if the plan anticipates that it has enough assets, it must get permission from the federal agency that oversees and insures pension plans: the Pension Benefit Guaranty Corporation, which we refer to as the Agency. Once that happens, a detailed timeline for terminating the plan is set by the Agency and the governing regulations. Under this schedule, the plan proceeds through several steps involving various accountings, forms, and approvals. Finally, the plan buys annuities from a third-party insurance company to ensure that the beneficiaries receive all the retirement benefits they have earned. This is referred to as the distribution of assets.

After the distribution of assets occurs, the plan certifies to the Agency that it has completed the process. The Agency reviews all the documents and either agrees or issues a notice of non-compliance. A notice of non-compliance nullifies all the plan's previous actions and renders it ongoing, which means that under the law

the plan has not terminated. Thus, it is still operating and must comply with all of the Act's provisions—this includes funding the plan. If a plan fails to comply with the Act's provisions, it can lose its qualified tax status, opening itself and its beneficiaries up to severe tax consequences and penalties. 26 U.S.C. § 411(d)(6)(A); *Id.* § 402(b)(1) (employees pay taxes on the contributions as gross income), *Id.* § 404(a)(5); *Flight Attendants Against UAL Offset v. Comm'r of Internal Revenue*, 165 F.3d 572, 574-75 (7th Cir. 1999); *e.g.*, John D. Colombo, *Paying for Sins of the Master: An Analysis of the Tax Effects of Pension Plan Disqualification and a Proposal for Reform*, 34 Ariz. L. R. 53, 54-57 (1992). Plans want to avoid losing their qualified tax-status at all costs. In fact, some refer to the threat of losing the qualified tax-status as the "'nuclear bomb' method of enforcement." *Id.* at 55.

### 2. The Finkl Plan Termination

Believing that the Plan's assets could cover its liabilities, Finkl began the tedious process for terminating the Plan. After it received permission from the Agency to proceed with the termination, the Agency set a target date for the Plan to finish the accountings and disburse its assets. Finkl also notified employees about the decision to terminate the Plan. Soon thereafter, the Plan adopted Amendment 1, which provided, in relevant part, that

> [i]f a Participant has not begun to receive a benefit under the Plan at the time benefits are to be distributed on account of termination of the Plan, *he may elect*

> *to receive his benefit* . . . under the Plan in the form of
> an *immediate annuity* or a deferred annuity . . . *regardless
> of whether he remains employed by the Employer*. (Empha-
> sis added.)

Much of this case centers on Amendment 1 and its effect.

After amending the formal, written pension plan
and sending out notice, problems began to arise. Citing
the fact that it had taken "considerably longer than antic-
ipated to complete benefit election forms," the Plan
wrote to the Agency and asked for more time. The
Agency granted it an extension. And months later, the
Plan again sought and was granted another extension
for completing the process.

Following this second extension—and fifteen months
after it was first scheduled to terminate—the Plan sent
the beneficiaries a benefit-election form. This form
showed the employees a dollar figure for the benefits
they individually should anticipate receiving every
month; it also let the employees choose whether they
wanted to receive an immediate annuity or wait for
retirement to start receiving benefits. A number of
Finkl's employees—several of them the plaintiffs in
this case—returned the forms with their own benefit
calculations on them, correcting what they believed
were erroneous calculations on the Plan's part. On the
forms, several of the employees also elected to receive
immediate life annuities while remaining employed
with Finkl. This would enable them to take full ad-
vantage of the benefit that Amendment 1 provided.

### 3. Finkl Withdraws from the Termination

Four days after receiving these forms, Finkl balked at finishing the termination process. Apparently when the forms were returned, Finkl realized that it had underestimated the Plan's outstanding obligations. In the words of Finkl's Human Resources Director, "[it] became concerned that the additional contribution Finkl would be required to make could be more than originally estimated." After Finkl realized that terminating the Plan would be too expensive, on May 28 it sent a letter to all the beneficiaries to notify them that the company was not going to terminate the Plan. At the same time, the Plan sent a letter to the Agency letting it know that the Plan would not continue with the termination process. Responding to the Plan's letter, on June 6 the Agency informed the Plan that as far as it was concerned the termination was withdrawn and the Plan remained ongoing. It also directed the Plan to notify its beneficiaries that "the Plan did not (or will not) terminate." Soon after, the Plan amended the contract a second time, nullifying Amendment 1 with Amendment 2, which provided that "[Amendment 1] is hereby deleted in its entirety."

### 4. Plaintiffs' Demands

Less than two weeks after this second amendment, the plaintiffs hired an attorney and demanded that the Plan immediately comply with Amendment 1 and distribute the Plan's assets. Specifically, the plaintiffs claimed that Amendment 2 violated the Act's anti-cutback provi-

sion. That provision prohibits pension plans from taking away beneficiaries' protected rights, lest the Plan lose its tax-qualified status. The Plan's attorney wrote back and told the plaintiffs that they were not entitled to the benefits they sought. The attorney articulated the same position that the Plan has taken throughout this litigation: the plaintiffs' right to receive the benefit offered under Amendment 1 was contingent on the Plan terminating, but since it was only in the process of terminating when Finkl decided to withdraw from the process, the Plan did not terminate. And since the Plan did not terminate, the plaintiffs did not have any right to the benefits promised under Amendment 1. The Plan also continued to operate as though it were an ongoing Plan complete with Finkl making periodic contributions.

Five months passed from the initial letter from Finkl's attorney, when the plaintiffs sent the Plan's attorney a second letter demanding that the pension committee review the claim forms that the plaintiffs had originally filed. On the original claim forms, the plaintiffs had opted to receive the annuity while working and claimed that the Plan had calculated their benefits incorrectly. In particular, the plaintiffs claimed that the Plan improperly excluded certain bonuses Finkl paid them from their pension-benefit calculation. Plaintiffs' second claim rests on how these bonuses are calculated. Like many companies, Finkl paid its employees bonuses. Initially, these bonuses were not counted towards the employees' pension benefits. But in 1991, Finkl amended the contract and started to categorize its bonuses, as

either special or regular. Under the contract's terms, regular bonuses counted towards an employee's benefit calculation for retirement, while special bonuses did not. The plaintiffs claimed that they didn't know about this distinction and that both should have been counted towards their final benefit calculation.

Ultimately, the Plan denied both claims. And when the plaintiffs appealed the denial through the Plan's review process, that appeal was also denied. In its decision, the pension committee echoed the reasoning given months earlier by the Plan's attorney: namely, the plaintiffs' right to an annuity while still working under Amendment 1 was contingent on the Plan terminating, but since the Plan never terminated, the plaintiffs weren't entitled to the annuity. The pension committee also rejected the plaintiffs' argument concerning the special bonuses.

After this, the plaintiffs filed suit repeating the claims and arguments they had made before the pension committee, while also claiming they were entitled to attorney's fees. In a very thorough order, the district court granted summary judgment in the Plan's favor. The court held that Amendment 2 did not violate the Act's anti-cutback provision, nor did it violate the Plan's own anti-cutback clause. The court also held that the plaintiffs had no legitimate claim to enhanced benefits by counting both regular and special bonuses in their pension-benefit calculation. And it held that the plaintiffs were not entitled to attorney's fees. The plaintiffs appeal, pressing the same arguments.

B.  Anti-Cutback Rule

The crux of this appeal is whether plaintiffs are entitled to the benefits promised them under Amendment 1—that is, do they have the right to receive a life annuity while still working at Finkl. Normally, beneficiaries do not receive their pension benefits before they actually retire. As a general matter, if a plan disburses plan assets to a beneficiary before he retirees, the plan will lose its protected tax-status. 26 U.S.C. § 401(a); Rev. Rule 56-693, 1956-2 CB 282 *modified by* Rev. Rule 60-323, 1960-2 CB 148; IRS Notice 2007-8 (noting "a qualified pension plan is generally not permitted to pay benefits before retirement"). There are narrow exceptions to this general statement, including an exception for terminating plans. Rev. Rule 60-323, 1960-2 C.B. 148 (1960). Terminated plans are allowed to disburse benefits to those enrolled in the plan regardless of their employment status, for the reason that a terminating plan is winding up its affairs by distributing the assets to the beneficiaries. But as we will see, the Plan here did not terminate, and so this exception does not apply.

Indeed, the general rule reflects the Act's purpose: to ensure that employers keep the promises they've made to retirees—"retirees" being the key term. *Cent. Laborers' Pension Fund v. Heinz*, 541 U.S. 739, 743 (2004). While plan administrators may freely and unilaterally amend the plan to address challenges and changes that arise, the Act has a specific provision that forbids plan administrators from amending plans in such a way that they

decrease beneficiaries' protected benefits. 29 U.S.C. § 1054(g); *Herman v. Central States, S.E. and S.W. Areas Pen.*, 423 F.3d 684, 691 (7th Cir. 2005) ("Plan amendments are permitted . . ., but an amendment may not decrease benefits that have already accrued." (quotation omitted)). We commonly refer to this as the anti-cutback provision. Under it, changes that diminish certain benefits are prohibited—in other words, there are certain promises the Plan must keep or lose its tax-protected status. *Heinz*, 541 U.S. at 746-47; *see also Board of Trustees of Sheet Metal Workers' Nat'l Pension Fund v. C.I.R.*, 318 F.3d 599, 602 (4th Cir. 2003) ("Under ERISA and the Tax Code, a qualified pension plan is exempt from taxation, and to remain qualified for tax-exempt status, a plan may not violate the anti-cutback rule which prohibits a plan's elimination or reduction of an accrued benefit."). Additionally, a plan can have its own anti-cutback clause that protects benefits beyond those listed in the statute. *See Call v. Ameritech Mgmt. Pension Plan*, 475 F.3d 816, 820 (7th Cir. 2007) (outlining one such case). And the Plan is obligated to abide by its own contract.

Here, the plaintiffs argue that they are entitled to relief under both the Act's anti-cutback prohibition and the pension plan's anti-cutback clause. So, there are two questions: first, whether Amendment 2 violated the Act's anti-cutback provision; second, whether Amendment 2 violated the contract's own anti-cutback clause. Concerning the first question, we don't offer the plan administrator's decision any deference—it is a legal question. *Diaz v. Prudential Ins. Co. of Am.*, 499 F.3d 640, 643 (7th Cir. 2007). Concerning the second question,

because the Plan gave the plan administrator discretion when interpreting the contract, we review its decision under the arbitrary-and-capricious standard. *Jenkins v. Price Waterhouse Long Term Disability*, 564 F.3d 856, 861 (7th Cir. 2009). Under that standard, we look to ensure that the administrator's decision "has rational support in the record." *Davis v. Unum Life Ins. Co. of Am.*, 444 F.3d 569, 576 (7th Cir. 2006) (quotation omitted).

### 1.  Protected Rights under the Act

For the plaintiffs to make a claim under the Act, they have to establish that Amendment 2, which simply deleted Amendment 1 in its entirety, diminished a benefit protected by the anti-cutback provision. 29 U.S.C. § 1054(g). That provision protects retirement subsidies, early-retirement benefits, and "accrued benefits," which are defined as any "annual benefit commencing at normal retirement age." *Id.* § 1002(23); 26 U.S.C. 411(d)(6). But Amendment 1 gave the plaintiffs the right to an immediate annuity while still working. It was not tied in any manner to the plaintiffs' actual retirement—and retirement is a necessary condition for a benefit to be considered an accrued benefit or an early-retirement benefit. Thus, Amendment 1 is not a protected benefit under any of those sections.

The anti-cutback provision also keeps plans from reducing an "optional form of benefit" offered in the pension plan. 29 U.S.C. § 1054(g)(1)(2)(B). The Act doesn't define the phrase "optional form of benefit," but the Treasury regulations define it as:

a distribution alternative (including the normal form of benefit) that is available under the plan with respect to an accrued benefit or a distribution alternative with respect to a retirement-type benefit.

26 C.F.R. § 1.411(d)-3(g)(6)(ii). Although that isn't a particularly clear definition, parsing the language gives some clarity to the regulation's meaning. The "distribution alternative" the regulation refers to means a beneficiary's right to choose how his pension payments will be made. *See Call*, 475 F.3d at 821. So, for example, a beneficiary can opt for a lump-sum payment instead of a fixed annuity when he retires. *Wetzler v. Illinois CPA Soc. & Foundation Ret. Income Plan*, 586 F.3d 1053, 1059 (7th Cir. 2009); 26 C.F.R. § 1.411(d)-4(b)(2) (providing other examples). Regardless of the form that the distribution alternative takes, an "optional form of benefit" is always tied to "an accrued benefit" or "a retirement-type benefit." 26 C.F.R. § 1.411(d)-3(g)(6)(ii). That is, with immaterial exceptions, the lump-sum payment has to be connected with the employee actually retiring. 29 U.S.C. 1002(23).

But here, the plaintiffs aren't retiring or taking a retirement-type benefit. They want to receive the annuity and keep on working for Finkl. Yet nothing in the Act, regulations, or case law suggests that an annuity to non-retired workers would qualify as an "optional form of benefit" under the Act. *Cf. Arndt v. Security Bank S.S.B. Employees' Pension Plan*, 182 F.3d 538, 549-42 (7th Cir. 1999) (holding that disability benefits are not retirement-type benefits); *Ross v. Pension*

*Plan for Hourly Employees of SKF Industries, Inc.*, 847 F.2d 329, 333 (6th Cir. 1988) (holding that a plant-shutdown benefit is not an "optional form of benefit"). Indeed, a distribution of that form could cause the Plan to violate § 401(a) and lose its tax-qualified status. IRS Notice 2007-8 (providing "a qualified pension plan is generally not permitted to pay benefits before retirement"). Thus, the benefit offered under Amendment 1 is not the type of promise that the Act's anti-cutback provision protects from revision.

### 2. The Plan's Anti-Cutback Clause

That doesn't mean the Plan's own anti-cutback clause cannot give broader protection than the Act and keep the beneficiaries from having Amendment 1 taken away from them. *See Call*, 475 F.3d at 821 (holding that the pension plan's anti-cutback language offered more protection than the Act's). Broadly written, the contract—Article 11.1(a) of the Plan, to be precise—protects against amendments that diminish benefits that have already accrued:

> No pension *benefit already accrued* at the time of such revocation, termination, amendment, alteration, modification, or suspension shall be discounted or reduced thereby. (Emphasis added.)

When the Plan denied the plaintiffs' claim, it viewed Amendment 1 as providing a protected benefit to the plaintiffs only if the Plan terminated. Absent its termination, the beneficiaries did not have a "pension benefit

already accrued" and thus a protected right to the immediate annuity while still working at Finkl. The plaintiffs argue first that this is an unreasonable reading of the Plan. And second, the plaintiffs argue that even if they only had an accrued right after the Plan terminated, the Plan did, in fact, terminate. So, under the Plan's logic, their rights under Amendment 1 have vested.

### a. Plan's Interpretation Was Reasonable

The plaintiffs' first argument—that the plan administrator's interpretation was arbitrary and capricious—rests on Amendment 1's text. Amendment 1 provides that the beneficiary's right to elect this annuity while working comes "at the time benefits are to be distributed on account of termination of the Plan." We read these contracts "sensibly." *Call*, 475 F.3d at 821. And a reasonable reading of Amendment 1 is that beneficiaries can elect to receive the benefit once the Plan terminates; until then, the beneficiaries don't have that right. Put differently, if the Plan's assets are not distributed, which does not happen unless the Plan terminates, then a beneficiary cannot choose to take the annuity and keep on working. Based on Amendment 1's text, the Plan's reading is reasonable.

### b. The Plan Did Not Terminate

In their briefs, the plaintiffs anticipated that we might read Amendment 1 this way, so they argue that if the Plan must terminate before they can receive the

annuity while still working, then the Plan has, in fact, terminated. As we noted above, a plan's termination is not a trifling affair. This is a highly regulated area of the law, and there is a prescribed and comprehensive process that pension plans must follow when they terminate, complete with forms, notifications, steps, approvals, deadlines, and finally, the distribution of assets. *E.g., Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 446 (1999). And the Act does not provide any method for voluntarily terminating a plan, except what is found in § 1341. To be sure, the Plan went through the initial steps—over a period of many months, it received permission from the Agency and gave employees notice. But the process goes beyond giving notice. In fact, the Plan did not come close to finishing the process the Act prescribes: the Plan never distributed its assets. 29 U.S.C. § 1341(b)(1)(D); 29 C.F.R. § 4041.21(a)(4) (to have a valid termination, a plan must distribute "the plan's assets").

Beyond that dispositive fact, everything else that attaches to a termination establishes that the Plan did not terminate. Indeed, Finkl was still making contributions to the Plan. Even more, the Agency and the IRS still consider the Plan an ongoing plan in full compliance with the Act. And if the Plan had gone through with some unauthorized, non-standard termination, those entities would not consider it in conformity with the Act. Had the Plan done that or if it had proceeded to give the plaintiffs the benefits they sought without having first terminated, the Plan would not conform with the Act. Again, plaintiffs aren't seeking an early retirement benefit—they don't want to retire, they want

to keep on working. This would not comply with the Act and would lead to immediate and severe tax consequences for the Plan and for the beneficiaries. Besides the immediate penalties that would be levied against the Plan, its beneficiaries would be taxed on all the Plan's contributions, even though they wouldn't have access to these benefits. Against this backdrop, nothing suggests that the Plan terminated, while everything points to the fact that the Plan has never terminated and remains ongoing. Thus, the Plan's decision that it never terminated and therefore the plaintiffs never accrued the right to receive an annuity while remaining employed with Finkl is reasonable and fully supported by the record.

### C. Benefit Calculation

While that resolves much of the plaintiffs' first claim, their second claim is a bit different. They allege that Finkl incorrectly calculated some of the plaintiffs' pension benefits. As noted above, Finkl awarded some of its employees bonuses, broken into two categories: regular and special. Originally the bonuses were not part of the employees's benefit calculations under the Plan. But Finkl amended the pension plan in 1991 to reflect that regular bonuses were figured into the beneficiary's benefit calculation, but special bonuses were not.

Finkl has consistently followed this practice for twenty years. In support of its motion for summary judgment, it produced substantial evidence, including the Plan documents, an affidavit, and its accounting records

that detail how these bonuses were calculated. In opposition, the plaintiffs refute these facts with a simple "not so" and an affidavit from one of the plaintiffs that he was unaware of the practice of counting regular bonuses but not special bonuses. But being unaware of a practice does not mean it is not a legitimate, accepted practice or that Finkl has not been abiding by it for twenty years. And plaintiffs' claimed ignorance of how these bonuses were distinguished and calculated is not enough to avoid summary judgment for the Plan. *Koszola v. Board of Educ. of City of Chicago*, 385 F.3d 1104, 1111 (7th Cir. 2004) (noting "summary judgment is the 'put up or shut up' moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events." (Quotation omitted.)). The plaintiffs have not produced any evidence that establishes a genuine issue of material fact for trial. Thus, the district court did not err in granting summary judgment in favor of Finkl.

   D.  Attorney's Fees

   The fact that plaintiffs cannot prevail on either of their substantive claims also resolves their claim for attorney's fees. A prerequisite to a party having a claim to an award of attorney's fees under the Act is that the petitioner has "achieved 'some success on the merits.'" *Hardt v. Reliance Standard Life Ins. Co.*, 130 S.Ct. 2149, 2159 (2010). The plaintiffs have not; thus the district court did not abuse its discretion by denying their claim.

E.  Conclusion

The plaintiffs' right to an annuity while working for Finkl is not a right protected by the Act. And Finkl's plan administrator gave a reasoned explanation for finding that the plaintiffs' right to such a benefit was not protected by the pension plan's anti-cutback clause. Thus, there was no error in granting summary judgment for the Plan. Further, the plaintiffs have failed to establish that the Plan's benefit calculation was arbitrary and capricious, and the district court did not err in denying the plaintiffs' claim for attorney's fees. Accordingly, the judgment of the district court is affirmed.