In the

# United States Court of Appeals

## For the Seventh Circuit

_____

No. 16-2790

DONNA GEIGER,

*Plaintiff-Appellant,*

*v.*

AETNA LIFE INSURANCE COMPANY,

*Defendant-Appellee.*

_____

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 15-cv-3791 — **Amy J. St. Eve**, *Judge.*

_____

ARGUED DECEMBER 5, 2016 — DECIDED JANUARY 6, 2017

_____

Before WOOD, *Chief Judge*, EASTERBROOK, *Circuit Judge*, and
SHADID, *District Judge.*[*]

SHADID, *District Judge.* Plaintiff-appellant Donna Geiger's
long term disability insurance benefits were terminated after
Aetna Life Insurance Company ("Aetna"), the insurer and ad-
ministrator of her employee welfare benefit plan ("the Plan"),

_____

[*] Of the Central District of Illinois, sitting by designation.

found that she no longer met the Plan's definition of total disability from any gainful occupation. After unsuccessfully appealing the termination decision, Geiger brought an action seeking reinstatement of her benefits in the United States District Court for the Northern District of Illinois. The district court denied Geiger's request to conduct limited discovery and ultimately granted summary judgment in favor of Aetna and against Geiger, holding that Aetna's decision was not arbitrary and capricious or a product of a conflict of interest warranting discovery. We affirm.

## I. Background

Geiger was an account executive for Sprint Nextel ("Sprint") from 2001 to 2009. As a Sprint employee, she received group long term disability insurance coverage under the Plan issued and underwritten by Aetna. On October 6, 2009, Geiger stopped working at Sprint and claimed short term disability precipitated by lumbar back pain and an L5-S1 discectomy from 2007, as well as bilateral ankle pain caused by avascular necrosis of the talar bones.[1] Sprint approved Geiger's disability claim later that same month.

Geiger had surgery on both ankles in January 2010 and underwent a left ankle arthroscopy and full ankle replacement in December 2010. During that time, Aetna determined that Geiger was disabled from her occupation as an account executive under the Plan and approved her claim for long term disability benefits. Aetna reasoned that Geiger was dis-

---

[1] A discectomy is a surgical procedure to remove a herniated intervertebral disc. Avascular necrosis of the talus is the death of bone tissue in the back of the foot caused by a lack of blood supply.

abled from her own occupation "due to bilateral avascular ne-crosis in ankles, which caused [Geiger] severe pain," and "she is unable to perform occupational duties as an account execu-tive because [she] is unable to do the required walking and driving for this occupation." Geiger received benefits in the amount of $4,012 per month, equal to 50% of her predisability earnings. Upon her approval for Social Security disability benefits, this amount was reduced to $784.

The Plan provided Geiger with benefits for up to 24 months if she continued to be disabled from her own occupa-tion. After 24 months, the Plan requires a claimant to be una-ble to work at any reasonable occupation, which the Plan de-fines as "any gainful occupation for which you are, or may reasonably become, fitted by: education; training; or experi-ence; and which results in; or can be expected to result in; an income of more than 60% of your adjusted predisability earn-ings."

Aetna reviewed Geiger's claim as the end of the initial 24-month period approached and investigated whether she met the more stringent "any reasonable occupation" definition of disability. As part of the investigation, Aetna invoked its right under the Plan to have Geiger examined by a physician of its choice, and on May 31, 2012, Dr. White examined Geiger and found her capable of performing sedentary work with mini-mal walking or standing. Aetna also placed Geiger under sur-veillance on two occasions in May 2012, where she was ob-served driving and visiting multiple stores. On August 20, 2012, Aetna informed Geiger that she no longer met the Plan's definition of disability and terminated her benefits.

Geiger appealed Aetna's determination in February 2013. As part of the review, Aetna obtained peer reviews from two

independent physicians, Drs. McPhee and Cirincione. Dr. McPhee concluded that Geiger's ankle condition would not preclude her from sedentary work. Dr. McPhee also consulted Geiger's anesthesiologist, Dr. Bukhalo, who agreed that Geiger was capable of sedentary work. Dr. Cirincione reached the opposite conclusion, finding that Geiger could not perform sedentary work.

On May 1, 2013, Aetna reinstated Geiger's benefits, finding "sufficient medical evidence to support a functional impairment which precluded the employee from performing the material duties of her own occupation," and concluding that Geiger met the more stringent standard of "being totally disabled from any gainful occupation" necessary to continue benefits beyond the 24 month period.

Because the Plan required proof of continued disability, Aetna began a subsequent review of Geiger's disability claim in December of 2013 and January of 2014 by conducting physical activity surveillance on four occasions. The surveillance videos showed Geiger climbing into and driving an SUV, shopping at multiple stores, and carrying a bag. Aetna also requested an "Attending Physician Statement" ("APS") from four of Geiger's physicians, but only Dr. Roy responded. On January 17, 2014, Dr. Roy completed the APS, confirmed Geiger's diagnoses, and opined that she was unable to work.

Aetna considered Dr. Roy's evaluation in conjunction with the previous peer review reports it received from Drs. White, McPhee, and Cirincione, and informed Geiger that it had submitted her medical file claim report for a comprehensive clinical review on April 7, 2014. Aetna first obtained a clinical review from an in-house nurse, Ms. Judy Tierney. Ms. Tierney

concluded that the record supported Dr. McPhee's assessment that Geiger was capable of sedentary work.

On April 24, 2014, Aetna's in-house vocation consultant, Janet Clifton, conducted a "Transferrable Skills Assessment" ("TSA") to determine whether reasonable sedentary occupations existed for Geiger. The TSA included occupations within a 100 mile radius with a mean wage greater than $30.16 per hour that matched Geiger's training, education, and work history. The TSA limited results to jobs with sedentary work for an 8 hour day, lifting or carrying 10 pounds occasionally, and standing, walking, or crouching occasionally. Based on the above criteria, the OASYS software produced two "fair" matches: Job Development Specialist and Commission Agent. Ms. Clifton's TSA concluded that these two occupations matched Geiger's capabilities, skills, and reasonable wage, and that a viable labor market existed.

On May 28, 2014, Aetna informed Geiger that it had again decided to terminate her long term disability benefits. Included in the letter was a summary of the surveillance, Dr. Roy's APS and the prior independent peer reviews, the comprehensive clinical review, and the TSA. Geiger appealed her termination of benefits on November 21, 2014. In support of her appeal, Geiger submitted witness statements, medical records, and physician reports, including reports from Dr. Feldmann, a pain specialist, Dr. Roy, her primary care physician, and Dr. Foroohar, a neurosurgeon. Dr. Feldmann declined to opine on Geiger's functional capacity but noted that Geiger reported improvements in her physical functioning. Dr. Foroohar reported that Geiger suffered from cervical spondylosis but did not restrict her from working.

Aetna retained Dr. Gutierrez, a board certified neurosurgeon, to conduct an independent physician peer review of Geiger's claim. On January 20, 2015, Dr. Gutierrez issued an initial peer review report. As part of his review, Dr. Gutierrez attempted to contact Drs. Roy, Feldmann, and Foroohar multiple times, but was unable to reach them. Dr. Gutierrez's review considered Geiger's prior medical history relating to her ankle and spine, video surveillance, reported physical exam findings and diagnostic testing results. He concluded that Geiger "does not have any profound functional impairments that are conclusively shown" and that "the medical documentation supports the claimant could sit, stand, use hands/arms/fingers to function consistently for 8-hour day."

On January 21, 2015, Aetna sent Drs. Roy, Feldmann, and Foroohar the peer review report by Dr. Gutierrez and the surveillance videos and asked them to respond with any points of disagreement or commentary. Dr. Feldmann provided the sole response, which stated that Geiger's activity in the surveillance video was the result of substantial amounts of pain medication, her restrictions on standing and walking should be more severe, and the impact of Geiger's recent cervical radiculopathy was not addressed in the report.

On February 16, 2015, Dr. Gutierrez completed another physician review report noting the concerns expressed by Dr. Feldmann. Dr. Gutierrez unsuccessfully attempted to contact Dr. Feldmann twice in February 2015. His second report reached the same conclusion as the first. On February 24, 2015, Aetna informed Geiger that after reviewing her appeal it agreed with the original decision to terminate Geiger's benefits.

On April 30, 2015, Geiger brought an action in the United States District Court for the Northern District of Illinois seeking reinstatement of her long term disability benefits. Geiger asserted that Aetna's decision was arbitrary and capricious because: (1) her benefits were terminated in the absence of medical improvement and did not give consideration to her worsening medical condition when she challenged the benefit denial; (2) Aetna disregarded the impact of her severe pain on her ability to work; and (3) Aetna improperly relied on inconclusive surveillance evidence. After Plaintiff's request to conduct limited discovery was denied, the parties cross-moved for summary judgment.

Judge St. Eve denied summary judgment for Geiger and granted summary judgment for Aetna, finding that Aetna's decision was not arbitrary and capricious. Specifically, the court found that Aetna: (1) minimized any conflict of interest stemming from its role as both administrator and insurer; (2) presented sufficient evidence supporting its decision to terminate benefits; (3) properly considered Geiger's cervical impairment and pain; and (4) properly considered the surveillance video as part of its decision.

## II. Discussion

Geiger presents two main issues on appeal: (1) whether Aetna's termination and later refusal to reinstate Geiger's benefits following her appeal was arbitrary and capricious; and (2) whether the district court abused its discretion in denying Geiger's request for discovery.

### A. The Arbitrary and Capricious Standard

"Absent special circumstances such as fraud or bad faith," ERISA plans that vest the administrator with discretionary

authority to construe the plan's terms or determine benefit el-
igibility are reviewed under the arbitrary and capricious
standard. *Semien v. Life Ins. Co. of N. Am.*, 436 F.3d 805, 812 (7th
Cir. 2006). A plan administrator's decision "may not be
deemed arbitrary and capricious so long as it is possible to
offer a reasoned explanation, based on the evidence, for that
decision." *Id*. (quoting *Trombetta v. Cragin Fed. Bank for Sav.
Emp. Stock Ownership Plan*, 102 F.3d 1435, 1438 (7th Cir. 1996)).
In other words, "the reviewing court must ensure only that a
plan administrator's decision has rational support in the rec-
ord." *Edwards v. Briggs & Stratton Ret. Plan*, 639 F.3d 355, 360
(7th Cir. 2011).

### i. The Occupational Assessment and TSA

Geiger first argues that Ms. Tierney's occupational assess-
ment was arbitrary and capricious because it ignored Dr.
Cirincione's evaluation and relied on Dr. McPhee's evaluation.
Ms. Tierney reviewed Geiger's entire file, including the sur-
veillance, and she acknowledged that Dr. Cirincione's report
conflicted with Dr. McPhee's. However, Dr. Cirincione's re-
port relied on Geiger's characterization of her ankle as "non-
weightbearing or at least partial weightbearing with cane or
assistive devices." Surveillance indicated that Geiger did not
use an assistive device and was able to enter and exit an SUV,
shop at multiple locations for extended periods of time, and
carry a shopping bag and purse. Ms. Tierney's occupational
assessment ultimately found that Geiger's file and medical
history "would not support impairment greater than the re-
views provided by Dr. McPhee and … Dr. Bukhalo on
4/12/13." The new surveillance evidence partially corrobo-
rated Dr. McPhee's report, and refuted Dr. Cirincione's report.

Thus, Ms. Tierney's decision to credit Dr. McPhee's findings had rational support in the record.

Second, Geiger asserts that Ms. Clifton's TSA did not consider the differing medical opinions and identified jobs that were inconsistent with Geiger's education, training and experience. The TSA found at least two sedentary jobs, including Job Development Specialist and Commission Agent, consistent with Geiger's skills and functional abilities and exceeded her wage criteria of $30.16 per hour. The Plan defines "reasonable occupation" as "any gainful occupation for which you are, *or may reasonably become*, fitted by: education; training; or experience; and which results in; *or can be expected to result in*; an income of more than 60% of your adjusted pre-disability earnings." (emphasis added).

Geiger argues that the occupational assessment improperly identified two qualifying occupations because she only had experience as an account manager at Sprint. However, the italicized language in the previous paragraph requires only that one "may reasonably become" fitted by education, training, or experience. Geiger also argues that as an employee with no prior experience as a job development specialist or commission agent she would likely earn less than the median income identified for those jobs. Again, the italicized language, "can be expected to result in," appears to contemplate that an employee's income would increase as he or she gains experience. Ms. Clifton's TSA had rational support in the record.

### ii. Geiger's Termination of Benefits and Appeal

Geiger argues that Aetna's termination of Geiger's benefits was arbitrary and capricious because Aetna relied on the

same evidence it had previously considered when it rein-stated her benefits, yet reached the opposite conclusion. Gei-ger claims that the only new evidence, the December 2013 video surveillance, showed her engaging in the same activi-ties as in the prior surveillance. In support, Geiger states that, under this Court's decision in *Leger v. Tribune Co. Long Term Disability Benefit Plan*, "the Plan should not be allowed to re-litigate what it already decided utilizing previously discred-ited evidence." 557 F.3d 823 (7th Cir. 2009).

As discussed above, the new surveillance evidence sup-ported Dr. McPhee's report and refuted Dr. Cirincione's re-port. As the plan administrator, Aetna was "entitled to seek and consider new information and, in appropriate cases, to change its mind." *Holmstrom v. Metro. Life Ins. Co.*, 615 F.3d 758, 767 (7th Cir. 2010). *Leger* did not hold that a plan admin-istrator's prior determination in favor (or against) a claimant "operates forever as an estoppel so that an insurer can never change its mind." *Legar*, 557 F.3d at 832 (quoting *McOsker v. Paul Revere Life Ins. Co.*, 279 F.3d 586, 589 (8th Cir. 2002)). In-deed, "ERISA does not prohibit a plan administrator from performing a periodic review of a beneficiary's disability sta-tus." *Holmstrom*, 615 F.3d at 767.

Geiger also takes issue with Aetna's appeal review, claim-ing that Dr. Gutierrez failed to specifically address her cervi-cal spine impairment. As the district court correctly noted, Dr. Gutierrez's initial report detailed Dr. Feldmann's physical exam, radiographs, MRI, and electrodiagnostic studies of Gei-ger's cervical spine, and explained that Geiger was "recom-mended for further surgery for multi-level radiculopathy" and had "a good prognosis for further functional improve-

ment." He concluded that Geiger "does not have any profound functional impairments that are conclusively shown" and that "the medical documentation supports the claimant could sit, stand, use hands/arms/fingers to function consistently for 8-hour day." Moreover, Dr. Gutierrez sent his initial peer review report to Geiger's physicians and asked them to respond with any points of disagreement or commentary. Dr. Feldmann provided the sole response, which stated that Geiger's activity in the surveillance video was the result of substantial amounts of pain medication, her restrictions on standing and walking should be more severe, and the impact of Geiger's recent cervical radiculopathy was not addressed in the report. Dr. Gutierrez completed another physician review report, which noted the concerns expressed by Dr. Feldmann. His second report reached the same conclusion as the first.

The district court correctly noted that Dr. Gutierrez acknowledged, rather than ignored, Geiger's pain from her cervical spine condition, but concluded that it would not prevent her from performing sedentary work during an eight hour workday. Dr. Gutierrez even anticipated further pain and provided additional limitations to avoid it. In sum, Aetna's termination and appeal review articulated "specific reasons for denial" and afforded Geiger "an opportunity for full and fair review by the administrator." *Holmstrom*, 615 F.3d at 766 (quoting *Tate v. Long Term Disability Plan for Salaried Emps. of Champion Int'l Corp. No. 506*, 545 F.3d 555, 559 (7th Cir. 2008)). Because Aetna's decision "has rational support in the record," its decision was not arbitrary and capricious. *Edwards*, 639 F.3d at 360.

### B. Geiger's Request for Discovery

Geiger also argues the district court abused its discretion in denying Geiger's request for discovery to depose Dr. Gutierrez and vocational consultant Clifton. Geiger claims that allegations in her complaint raised legitimate doubt as to whether Aetna was acting as a neutral fiduciary and if Aetna's medical and vocational consultants presented valid, objective opinions based on the entire claim record. In her complaint, Geiger alleged the following demonstrated a conflict of interest sufficient to allow discovery: Aetna's repeated termination of her benefits, the termination of benefits on the eve of losing Social Security dependent benefits, the "deliberate" and "intentionally biased" review by the vocational consultant, and Dr. Gutierrez's deliberate disregard of her cervical spine impairment.

A conflict of interest exists when, "as in this case, a plan administrator has both the discretionary authority to determine eligibility for benefits and the obligation to pay benefits when due." *Edwards*, 639 F.3d at 364 (quoting *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 108 (2008)). In *Semien*, this Court held "that discovery in a case challenging the benefits determination of plan administrators is permissible only in 'exceptional' circumstances … in which the claimant can 'identify a specific conflict of interest or instance of misconduct' and 'make a prima facie showing that there is good cause to believe limited discovery will reveal a procedural defect.'" *Dennison v. MONY Life Ret. Sec. Plan for Emps.*, 710 F.3d 741, 746 (7th Cir. 2013) (quoting *Semien*, 436 F.3d at 815)). However, following the Supreme Court's decision in *Glenn*, we recognized "a softening, but not a rejection, of the standard announced in *Semien*." *Dennison*, 710 F.3d at 747. "[C]onflicts are

but one factor among many that a reviewing judge must take into account." *Glenn*, 554 U.S. at 116. "It is thus not the existence of a conflict of interest—which is a given in almost all ERISA cases—but the *gravity* of the conflict, as inferred from the circumstances, that is critical. *Marrs v. Motorola, Inc.*, 577 F.3d 783, 789 (7th Cir. 2009). Conflicts "carry less weight when the insurer took active steps to reduce potential bias and to promote accuracy." *Raybourne v. Cigna Life Ins. Co. of New York*, 700 F.3d 1076, 1082 (7th Cir. 2012).

Here, the district court found that Aetna minimized any conflict of interest by implementing multiple safeguards. First, Aetna obtained numerous independent physician peer reviews. Second, Aetna and the independent physicians reached out to Geiger's own physicians and addressed their concerns. Third, Aetna sent the surveillance video to Geiger's physicians to ensure the video was assessed objectively. Finally, Aetna previously reversed its own decision and reinstated her benefits. The district court found that Aetna's procedures were reasonable and sufficiently safeguarded against a detrimental conflict of interest, and denied Geiger's request to conduct discovery. "[T]rial courts retain broad discretion to limit and manage discovery under Rule 26 of the civil rules." *Dennison*, 710 F.3d at 747. We agree with the district court's conflict analysis, and thus find that the district court did not abuse its discretion in denying Geiger's request for discovery.

In sum, we find that Aetna's decision to terminate Geiger's long term disability benefits was not arbitrary and capricious, and the district court did not abuse its discretion in denying Geiger's request for discovery. We therefore affirm the judgment of the district court.

AFFIRMED