In the

# United States Court of Appeals
## For the Seventh Circuit

―――――――――――

No. 23-3356

ESTATE OF MICHAEL GIFFORD, by its special administrator,
SUZANNE GIFFORD,

*Plaintiff-Appellant*,

*v.*

OPERATING ENGINEERS 139 HEALTH BENEFIT FUND,

*Defendant-Appellee.*

―――――――――――

Appeal from the United States District Court for the
Eastern District of Wisconsin.
No. 2:22-cv-00221 — **Lynn Adelman**, *Judge.*

―――――――――――

ARGUED SEPTEMBER 13, 2024 — DECIDED JANUARY 13, 2025

―――――――――――

Before EASTERBROOK, JACKSON-AKIWUMI, and KOLAR, *Circuit Judges*.

KOLAR, *Circuit Judge*. This is a tragic case. Michael Gifford was a beneficiary of the Defendant-Appellee's Health Benefit Fund (the Fund) who passed away after seeking medical treatment. This litigation began after the Fund denied a claim for reimbursement of Gifford's out-of-network medical expenses. Because of the deferential standard of review for

decisions made by the Fund, we are compelled to affirm the district court's decision to grant the Fund's motion for summary judgment and its related discovery motion.

## I. Background

We begin with a description of the health benefit plan governing the scope of Gifford's medical benefits, then turn to Gifford's medical treatment in July 2021, and finally describe the administrative appeal arising from the denial of benefits, which preceded this litigation.

### A. Operating Engineers 139 Health Benefit Fund

Michael Gifford was a beneficiary of the Operating Engineers 139 Health Benefit Fund, which is a self-insured employee benefit plan (the Plan) established by the International Union of Operating Engineers Local 139 to provide medical benefits to employees and their dependents. The Plan is governed by the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1001 *et seq.*, and administered by a Board of Trustees. The Board of Trustees is comprised of employee trustees appointed by the union and employer trustees appointed by the employer association (Trustees). The Trustees are tasked with determining the benefits provided in accordance with the Plan.

The Plan is governed by a Summary Plan Description (SPD), which grants Trustees broad discretion to interpret the Plan and determine eligibility for benefits.[1] The SPD provides:

---

[1] While the parties agree that the Summary Plan Description constitutes the ERISA-required plan document, we note that summary documents can communicate information to beneficiaries *about* an ERISA plan, but "their statements do not themselves constitute the *terms* of the plan."

> The Trustees or, where Trustee responsibility has been delegated to others, the other persons, will be the sole judges of the standard of proof required in any case and the application and interpretation of the Plan. Decisions of the Trustees or their delegates are final and binding. The Trustees or their delegates have broad discretion to determine eligibility for benefits and to interpret Plan language and their decisions will be accorded judicial deference in any subsequent action at a court or administrative proceeding.
>
> **Benefits under this Plan will be paid only when the Trustees decide, or persons delegated by the Trustees decide, in their discretion, that [a participant] or a beneficiary is entitled to benefits in accordance with the terms of the Plan.**

(emphasis in original).

The SPD states that benefits "are designed to provide coverage only for care that is Medically Necessary in the treatment of an illness or injury." A service or supply is "Medically Necessary" if it is required to treat a condition. Under the Plan, a service is not automatically considered "Medically Necessary" simply because it is prescribed by a physician—in other words, Trustees are the final arbiters, not treating physicians. Further, inpatient care in a hospital is "Medically

---

*CIGNA Corp. v. Amara*, 563 U.S. 421, 438 (2011) (emphasis in original). For purposes of this case, we need not further address the distinctions.

Necessary" only if treatment for the illness or injury cannot be provided safely on an outpatient basis.

The SPD also explains how claims are handled for out-of-network providers, stating that "[i]n general, the Fund does not cover charges from out-of-network providers." This provision is subject to an exception: "In the event of an emergency, out-of-network treatment and services are covered … subject to all other Plan limits and exclusions, including but not limited to … Medical[] Necess[ity]." The SPD encourages participants to "always check to see if [their] provider is in the network" but recognizes that confirming in-network status may not be possible "[i]n the event of an emergency."

The SPD incorporates the Plan's "Summary of Benefits." The Summary of Benefits reminds participants that they "**must** get [their] medical care from providers who participate in the Anthem medical [Preferred Provider Organization] network" in order for participants' care to be covered by the Plan. (emphasis in original). While "[a]ll inpatient and certain outpatient services require pre-authorization," the Summary of Benefits again recognizes an exception "[i]n the event of an emergency" when confirming that a provider is in network may not be possible.

The SPD also sets forth instructions for appealing an adverse benefits decision. A participant may appeal a denial of benefits in writing and must explain her reasons for disagreement. Importantly, the SPD further instructs:

> [A participant] may provide any supporting documents or additional comments related to this review. When filing an appeal [the participant] may:

- Submit additional materials, including comments, statements, or documents; and

- Request to review all relevant information (free of charge).

Records and documents [a participant] submit[s] on appeal will be considered without regard to whether such information was submitted or considered in the initial benefit determination.

The SPD provides an opportunity for the participant to appear before the Trustees to present any additional information.

When a timely appeal is filed, "a new, full, and independent review of [the] claim will be made, and the decision will not be deferred to the initial benefit decision." Then, the Board of Trustees will make a final decision based on "all information used in the initial determination as well as any additional information submitted" during the appeal.

### B. Gifford's Medical Treatment in July 2021

On July 4, 2021, Gifford was admitted to Froedtert South Hospital in Kenosha County, Wisconsin, where doctors determined that he was experiencing a stroke.[2] After a neurology consultation, Gifford was given medication—a tissue plasminogen activator (tPA)—to treat the stroke. Hospital records

---

[2] The Estate's counsel at oral argument represented that Gifford did not, in fact, suffer a stroke. However, this is belied by the medical records and the Estate's own brief, which states that "Mr. Gifford had a stroke, and then was diagnosed with an aneurysm."

reveal that "[s]hortly after receiving [t]PA, [Gifford's] weakness disappeared," and he "was able to move his right upper and lower extremity just like prior to his symptoms." Thus, records state that the tPA caused "complete resolution of symptoms." However, because Gifford received the tPA, he was required to remain in the hospital for 24 hours for observation.

Doctors then examined the results of a CT scan performed in the course of treating Gifford's stroke and discovered a small brain aneurysm. Medical records from July 5 state that the aneurysm was an "[i]ncidental finding as part of [the] stroke work up" and that it would "need monitoring occasionally." Treating physicians recommended outpatient evaluation and surveillance. The records reflect that the treating physicians referred Gifford to a neurosurgeon for consultation.

On July 6, Gifford met with Dr. Arvind Ahuja, an out-of-network neurosurgeon. Dr. Ahuja performed an angiogram to evaluate the aneurysm and recommended surgery to "clip" the aneurysm. Medical records reflect that the risks of surgery were reviewed with Gifford and included bleeding, infection, hemorrhage, and death. Gifford decided to proceed and scheduled surgery for the next day. According to a declaration provided by Dr. Ahuja during this litigation, he believed the surgery was necessary because he identified vasospasm—the narrowing of a brain blood vessel—following a small bleed from the aneurysm.

On July 7, Gifford underwent brain surgery. Assessment notes following the procedure describe that the aneurysm was larger than it appeared on diagnostic workups and that there was evidence of prior bleeding. Medical records

indicated that the surgical clipping was "very challenging and complicated by bleeding issues." Tragically, Gifford never recovered from the procedure and passed away in the hospital on July 18, 2021.

### C. The Denial of Benefits and Administrative Appeal

Dr. Ahuja's medical practice, Neurosurgery and Endovascular Associates, submitted a claim to the Fund for payment for the services provided to Gifford, including the brain surgery. The Fund denied the claim because Dr. Ahuja was an out-of-network provider and the services rendered were not provided in the course of a medical emergency. Nor were the services deemed to be medically necessary.

Following this denial, Michael Gifford's wife, Suzanne Gifford, sent a letter to the Fund appealing the Fund's determination that the surgery was not performed in the event of an emergency. She stated that "a stroke with a ruptured brain aneurysm is a clear emergency." While the Plan allowed Suzanne Gifford to provide additional information and documents in support of her appeal and to request additional information from the Fund, she did not do so. She also did not request to appear before the Trustees to present additional information. While the Fund could have taken additional steps to provide advice to a grieving widow, it was not obligated by law to do so.

After receiving the appeal, the Fund contacted two independent medical review firms to review Gifford's medical records and determine if the surgery was performed in the event of an emergency and/or was medically necessary. The first independent review was conducted by Dr. Luc Jasmin, a

board-certified neurosurgeon. Dr. Jasmin reviewed hospital documentation dated July 4, 2021 through July 19, 2021. In his report, Dr. Jasmin stated that the Fund asked him to determine whether the surgical clipping of Gifford's aneurysm was considered a medical emergency. Dr. Jasmin found it was not. In fact, Dr. Jasmin opined that performing surgery on the aneurysm so soon after Gifford's stroke likely exposed him to "a higher risk of complication than if it had been postponed to a later date."

The second independent reviewer was Dr. Paul Kaloostian, who is also a board-certified neurosurgeon. Dr. Kaloostian reviewed the clinical documentation and concluded that the surgery was neither medically necessary nor performed in the event of an emergency. He explained that the aneurysm was small, "completely incidental," and that there was "no emergency and no stroke" on the date of service. Dr. Kaloostian opined that the treating providers had time to contact insurance regarding in-network options. Both independent medical reviewers certified that their compensation was not dependent upon the conclusions offered in their reports and that no conflicts of interest existed.

The Fund's appeals committee—comprised of an equal number of employee trustees and management trustees—then met to consider the appeal. Before the meeting, committee members were provided with Suzanne Gifford's appeal letter, a summary of facts prepared by the Plan's administrator, and the two independent medical review reports. The committee ultimately denied the appeal, and the full Board of Trustees adopted the committee's decision during a November 2021 board meeting.

The Fund notified Suzanne Gifford of its decision, explaining that the claim was reviewed by two independent medical review firms, which both concluded that the surgery was not performed in the event of an emergency. As such, the Fund explained, the out-of-network services provided by Dr. Ahuja were not covered by the Plan. The Fund's decision prompted the Plaintiff-Appellant, the Estate of Michael Gifford, by its special administrator Suzanne Gifford (the Estate), to bring this lawsuit under ERISA.

The Estate filed suit in February 2022, asserting a claim for wrongful denial of benefits, 29 U.S.C. § 1132(a)(1)(B), as well as a claim for alleged statutory violations committed in connection with the benefits denial, 29 U.S.C. § 1132(a)(3).[3] After the administrative record—examined and relied upon by the Fund and the independent medical examiners—was provided by the Fund in this litigation, the Estate sought additional discovery outside of the administrative record. In response, the Fund moved for a protective order.

While that motion was pending, both parties filed for summary judgment. The Estate offered evidence not previously provided to the Fund during the administrative appeal, including some "missing" records and the declaration prepared by Dr. Ahuja. The "missing" records contained two reports prepared by Dr. Ahuja after he provided the surgical services. One described the angiogram performed and the other

---

[3] The Estate also brought a claim in its amended complaint for breach of fiduciary duty under 29 U.S.C. § 1132(a)(2), which was dismissed by the district court. The Estate does not appeal the dismissal of this claim, and thus it is not at issue.

described the aneurysm clipping. The document containing the two reports was later referred to as the surgical note.

Dr. Ahuja's corresponding declaration sought to provide context for the surgical note and explain why Gifford's surgery was indeed a medical necessity. Specifically, Dr. Ahuja claimed that his surgical note reflects his identification—after imaging but before surgery—of vasospasm, which followed a small sentinel bleed from the aneurysm. The vasospasm diagnosis, according to Dr. Ahuja, was missed by attending physicians and is what necessitated the surgical procedure and its timeframe. Dr. Ahuja opined that "a competent physician who reviewed the surgery note" would conclude that the presence of vasospasm meant that emergency surgery was required. Dr. Ahuja's declaration explained that he entered the surgical note into the hospital's electronic records system. However, the surgical note was drafted after the procedures were performed and last signed by Dr. Ahuja on July 19, 2021—twelve days after Gifford's brain surgery. Gifford's medical records were otherwise sent via fax to the Fund, but the surgical note was not included. It is unclear from the record exactly why the hospital did not fax the note along with Gifford's file. One possible explanation based on the documents' time stamps is that the note was finalized and signed by Dr. Ahuja after the final fax was sent. In any event, the Fund did not have it, and the note was not a part of the administrative record.

The district court granted the Fund's motion for summary judgment, denied Gifford's motion for partial summary judgment, and granted the Fund's motion for a protective order. The district court held that the Fund's denial of benefits was not arbitrary and capricious, and thus granted the Fund's

motion for summary judgment on the first claim. The district court likewise granted summary judgment on the equitable relief claim, concluding it failed because the Trustees' interpretation of the Plan's terms fell "within the range of reasonable interpretations."

Finding that discovery outside of the administrative record was unwarranted, the district court also granted the Fund's motion for a protective order. The Estate then filed a motion for reconsideration under Federal Rule of Civil Procedure 59, arguing that the district court erred in holding that the Fund provided a full and fair review, and in the alternative, that the matter should be remanded to the Fund with directions to consider Dr. Ahuja's surgical note. The district court denied the Estate's motion, holding that the Estate failed to show the Fund violated any procedural requirements in its review and concluding that, absent a violation of ERISA's procedural requirements, remand was inappropriate.

We now review the merits of these decisions.

## II. Analysis

We review the district court's grant of summary judgment *de novo*. *Hightshue v. AIG Life Ins. Co.*, 135 F.3d 1144, 1147 (7th Cir. 1998). Summary judgment is appropriate when the movant is entitled to judgment as a matter of law and there is no genuine dispute of material fact. *Dunn v. Menard, Inc.*, 880 F.3d 899, 905 (7th Cir. 2018).

When an ERISA plan gives discretion to its administrator to pay or deny claims, we review the administrator's decision under the arbitrary and capricious standard. *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 110–11, 115 (1989). Under this deferential standard, "the plan's decision to deny [the

participant] benefits is reviewed only to determine if it was 'downright unreasonable.'" *Brehmer v. Inland Steel Indus. Pension Plan*, 114 F.3d 656, 660 (7th Cir. 1997) (quoting *Donato v. Metro. Life Ins. Co.*, 19 F.3d 375, 380 (7th Cir. 1994)). If the administrator's decision "was made rationally and in good faith, we will not second-guess whether the decision is right." *Hightshue*, 135 F.3d at 1147 (cleaned up).

In this case, the Plan grants its administrator—the Board of Trustees—discretion to determine if a participant or beneficiary "is entitled to benefits in accordance with the terms of the Plan." Indeed, the Trustees or their delegates "have broad discretion to determine eligibility for benefits and to interpret Plan language." As such, our task is to determine whether the Trustees' denial of benefits is "clearly unreasonable" under the arbitrary and capricious standard of review. *Hightshue*, 135 F.3d at 1147. We consider factors like whether the Board of Trustees: (1) communicated specific reasons for its determination; (2) afforded the claimant an opportunity for a full and fair review; and (3) whether there was an absence of reasoning to support its determination. *Majeski v. Metro. Life Ins. Co.*, 590 F.3d 478, 484 (7th Cir. 2009). Our focus is whether a full and fair review occurred—the lone issue the Estate advances on appeal.

## A. The Estate's Denial of Benefits Claim

The Estate first argues that the district court improperly denied its motion for summary judgment on its claim for benefits under ERISA. *See* 29 U.S.C. § 1132(a)(1)(B) (a civil action may be brought by a participant or beneficiary "to recover benefits due to him under the terms of his plan" or to "enforce his rights under the terms of the plan"). Specifically, the Estate asserts that the Fund failed to conduct a full and fair review

because it failed to retrieve and review the "missing" surgical note. We disagree.

ERISA provides that after an adverse benefits determination, an employee benefit plan must "afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review." 29 U.S.C. § 1133(2). The Plan itself promises to undertake a "new, full, and independent review" of the claim and to make a decision "based on all information used in the initial determination as well as any additional information submitted."

The Estate faults the Fund for failing to notice the surgical note was missing from among the medical records provided by the hospital. As such, the Estate contends that the Fund should not have relied upon the independent medical reviewers' opinions because the reviewers also did not receive, and therefore could not have considered, Dr. Ahuja's surgical note. But the Estate adds a requirement found nowhere in the Plan or ERISA—that the Fund was required to seek out additional information it did not know existed.

Rather, the "[r]esponsibility for any undiscovered evidence lies with [the claimant]," who is best positioned and most motivated to provide additional information in support of her claim. *Lane v. Structural Iron Workers Loc. No. 1 Pension Tr. Fund*, 74 F.4th 445, 452–53 (7th Cir. 2023). The Plan explicitly provides that a claimant can submit additional documents, comments, materials, or statements to the Fund for consideration—regardless of whether they were previously included in the administrative record. Suzanne Gifford did not submit anything further—for instance, Dr. Ahuja's surgical note, statements or impressions from Dr. Ahuja or any other treating physician, attestations to discussions with

treating providers leading up to the surgery, or declarations containing the medical opinion that the aneurysm required emergency surgery. The Plan also allows a claimant to request to review all relevant information used to deny the appeal, free of charge. Such a review might shed light on any documents missing from the administrative record. However, that review was not requested.

It is true that ERISA contemplates a collaborative process for adjudicating claims; if evidence is readily available and would clarify a participant's entitlement to benefits, the administrator should undertake reasonable efforts to obtain the evidence. *Lane*, 74 F.4th at 452. However, we have recognized that plan administrators face time and resource constraints. *See id*. at 452–53. The Estate presents no evidence that the Fund knew of the missing surgical note, nor does the record reflect that the Fund should have known such a note was missing.

On this record, a reasonable plan administrator would not have reason to believe documents finalized twelve days after the surgery in question—documents which primarily reflect observations made *during* the surgery—would both exist and be critical to the question of whether the patient required emergency surgery in the first place. Indeed, the timestamps suggest that Dr. Ahuja signed and entered the surgical note after the hospital faxed Gifford's file to the Fund on July 19, 2021. Accordingly, the surgical note was not a part of the administrative record considered by the Fund or the independent medical reviewers.[4]

---

[4] The Estate suggests on appeal that the Fund did have access to the surgical note through Epic Systems' electronic medical records software.

Relying on *Garner v. Central States, Southeast & Southwest Areas Health & Welfare Fund Active Plan*, 31 F.4th 854 (4th Cir. 2022), the Estate urges that the Fund's failure to provide the surgical note to the independent medical reviewers means that the Fund did not perform a full and fair review. *Garner* involved a plaintiff who suffered from back and neck pain. *Id.* at 856. When the pain worsened over multiple years, and other treatments did not alleviate it, the plaintiff's doctor ordered an MRI. *Id.* After reviewing the MRI results, the treating physician concluded that surgery would help relieve the plaintiff's ongoing symptoms. *Id.* As a result, the plaintiff underwent spinal surgery about a month later. *Id.* However, the plaintiff's employee benefits plan denied the claim for payment, finding the procedure was not medically necessary and therefore not covered by the plan. *Id.*

During the administrative appeal, an independent medical reviewer noted that the records provided to him did not contain the MRI report that led the treating physician to recommend surgery. *Id.* at 856–57. He also noted the absence of any office visit notes supporting that recommendation. *Id.* at 857. The reviewer concluded that there was no basis within the medical file provided to justify the surgery, and critically,

---

Citing to Froedtert's public website, the Estate explains that Froedtert utilizes Epic's electronic records system, which provides view-only access to a patient's full Froedtert health record. Froedtert uses the Epic system internally, but the Estate provides no evidence that a patient's medical records are available outside of the hospital network. Indeed, that would be unlikely, especially given, as Dr. Ahuja explained in his declaration, that the system is designed for use by hospitals and treating physicians, not insurance companies and plan administrators. The record lacks evidence that the Fund and the independent medical reviewers ever had access to the Epic system, and the Estate offers none.

cited the "absence of an 'official MRI report' or any documentation concerning 'the severity of symptoms'" as a reason for his conclusion. *Id*. at 858. When the plan received the reviewer's report—including his note about the absence of an MRI report—it again failed to provide the MRI report to the independent medical reviewer despite possessing it. *Id.* Instead, the plan simply denied the claim for the reasons set forth in the reviewer's report. *Id.*

The Fourth Circuit held that the plan did not engage in a "reasoned and principled" decision when critical information was in its possession yet it failed to provide that information to the independent medical reviewer. *Id*. Further, the Fourth Circuit concluded that providing the full file—including the MRI report—to a second independent medical reviewer did not cure the plan's error because the record indicated the plan still relied on *both* reviewers' reports in reaching its decision, rather than the only report that contemplated the full record. *Id*. at 859.

But the present case is not on all fours with *Garner* as the Estate suggests. Unlike *Garner*, the Fund did not actually possess the missing file and simply fail to pass it along to an independent medical reviewer. Further distinguishing *Garner* is the fact that the medical reviewers here did not specifically note the lack of a particular medical record and indicate that its absence led to their final conclusions. While the plan in *Garner* "had complete access to [the plaintiff's] relevant medical records" and "repeatedly failed" to handle the claim in a reasonable manner, "even with the benefit of these records," here, of course, the Fund did not possess the surgical note. *Id.* at 860. And, as a practical matter, the nature of the "missing" records is temporally different. The MRI report in *Garner*

reflected the reasons the forthcoming surgery was necessary, whereas Dr. Ahuja's surgical note primarily contained notes and impressions made during the procedure in question— when the services were already decided upon and underway. As the Fund points out, the surgical note adds little to the conversation about why the surgery and related services were deemed emergencies and medically necessary prior to the procedure occurring.

Even so, the Estate argues that neither the Fund nor the independent medical reviewers were aware of the vasospasm and bleeding discovered by Dr. Ahuja and thus failed to make an informed decision. In support, the Estate offers Dr. Ahuja's declaration, which explains that the vasospasm diagnosis necessitated both the surgical procedure and its emergency timeframe. Of course, Dr. Ahuja's declaration was not offered as additional support during the administrative appeal, so the Fund could not have considered it.

Even setting that fact aside, the declaration does not convince us that Dr. Ahuja's surgical note indicating vasospasm and bleeding would have altered the Fund's determination. First, hospital records prior to July 7, 2021—the date of the surgery—explicitly state that a "non-ruptured … 5 mm brain aneurysm" was incidentally found as a part of the stroke work-up. Based on Gifford's CT scan, his treating physicians opined that the aneurysm would require occasional monitoring and follow up with a neurosurgeon on an outpatient basis. Accordingly, the Trustees could reasonably conclude that nothing in the hospital records leading up to the surgery indicated that the procedure was medically necessary, let alone that it needed to be performed on an emergency basis. Hospital records from the day of surgery and thereafter do capture

that a "[l]arger aneurysm" was found "with evidence of prior bleeding" and that the aneurysm was "much larger than [it] appear[ed] on [the] diagnostic work-up." But those too were considered by the independent medical reviewers, and the reviewers still concluded the surgery was not performed in the face of an emergency.

With the broad discretion afforded under the Plan, the Board of Trustees was free to weigh the full range of medical notes within the administrative record—including the notes entered before the surgery and those created on July 7 and thereafter, which indicated there was evidence of prior bleeding. Nothing in the record demonstrates that the Board of Trustees failed to review the full administrative record when considering Suzanne Gifford's administrative appeal.

To put a finer point on this: aside from Dr. Ahuja's declaration, nothing in the record supports his belief that evidence of bleeding required emergency surgery on the aneurysm. As discussed, medical records from the day of surgery onward— all contained within the administrative record and examined by the Board of Trustees and independent medical reviewers—noted the "evidence of prior bleeding." Yet these findings did not lead the Trustees or two board-certified neurosurgeons to conclude that the surgery was performed in the event of an emergency. Evidence of bleeding or lack thereof was not a supporting reason listed in the Board of Trustees' meeting minutes denying the claim on appeal, nor in the letter provided to Suzanne Gifford explaining the denial. In other words, whether or not bleeding occurred was not central to the ultimate conclusion.

Moreover, it was reasonable for the Trustees to rely on the two independent medical reviewers' reports. Dr. Kaloostian's

report acknowledged Gifford's stroke, admission to the intensive care unit, tPA treatment, and the imaging that depicted a non-ruptured aneurysm. Dr. Kaloostian also referenced the angiogram, surgical clipping (which he noted was "complicated") and acknowledged the "noted rupture and cerebral edema" within the hospital records. Based on the file, he concluded that there was "no emergency and no stroke" on the date of the surgical services and opined that the providers had time to contact insurance regarding in-network providers.

Dr. Jasmin's report detailed Gifford's entire hospital stay from July 4 through July 18, 2021. It likewise described the discovery of the aneurysm, the angiogram, and surgery. Dr. Jasmin noted that there was "a combination of cerebral edema and some blood" with "loss of gray matter differentiation" on Gifford's CT scan completed post-surgery. Dr. Jasmin also stated that "there is no indication that this aneurysm had bled or was about to rupture. No evidence was provided that there was an association between the unruptured aneurysm and the stroke."

We note that Dr. Jasmin's statement that "there is no indication that [the] aneurysm had bled" is consistent with Gifford's pre-operative medical records but in tension with some of the medical records from July 7, 2021 onward. We cannot say whether Dr. Jasmin was remarking on the lack of evidence of bleeding in the record leading up to the surgery, whether he disagreed with the treating physicians' finding of bleeding entered into the record on July 7, or something else. Importantly, the report does not condition Dr. Jasmin's ultimate conclusion on the fact that the aneurysm hadn't bled. Instead, Dr. Jasmin's four-page report makes many observations, explicitly states that he examined hospital records

spanning from July 4, 2021 through July 19, 2021, and provides rationale for the conclusion that the surgical clipping was not medically necessary—including because the aneurysm could have been addressed in the following weeks on an out-patient basis. Dr. Jasmin went as far as to opine that performing brain surgery so soon after Gifford's acute stroke "likely exposed the patient to a higher risk of complication than if it had been postponed to a later date."

This is not to say that a potentially contradictory statement contained in an independent medical report could never mean a plan's reliance on the report was unreasonable. But given all of the circumstances, that was not the case here. Plan administrators may accept independent reviewers' conclusions so long as they "provided a non-arbitrary explanation for [their] conclusion." *Williams v. Aetna Life Ins. Co.*, 509 F.3d 317, 324 (7th Cir. 2007). Here, both reviewers considered all medical records provided by the hospital to the Fund, listed references to medical literature reviewed, and ultimately provided non-arbitrary explanations for their conclusions. It was therefore reasonable for the Board of Trustees to rely on the reports as part of its review of Suzanne Gifford's appeal. *See Lane*, 74 F.4th at 452; *see also Williams*, 509 F.3d at 324–25.

We return to the core requirements of a full and fair review: (1) knowing what evidence the decision-maker relied upon; (2) having an opportunity to address the accuracy and reliability of that evidence; and (3) having the decision-maker consider the evidence presented by both parties prior to reaching the decision. *Militello v. Cent. States, Se. & Sw. Areas Pension Fund*, 360 F.3d 681, 690 (7th Cir. 2004) (citation omitted). The Estate does not actually assert on appeal that these requirements were not met. Instead, the Estate argues that the

Fund was required to do more. On the record before us, we cannot agree. The Estate offers no authority supporting the additional requirement it suggests—that the Fund was required to recognize that a post-operative surgical note was missing from a participant's medical file and was then required to track down the document it did not know existed.

Moreover, there is no evidence the Fund rejected the Estate's claim "based on selective readings that are not reasonably consistent with the entire picture," the hallmark of an arbitrary and capricious decision. *Holmstrom v. Metro. Life Ins. Co.*, 615 F.3d 758, 777 (7th Cir. 2010). Rather, the record demonstrates that the Fund and the independent medical reviewers examined all hospital records contained within the administrative record, which were provided directly by Froedtert South Hospital. The Fund communicated the reasons for the Trustees' unanimous denial of the appeal to Suzanne Gifford, citing relevant portions of the Plan and explaining the conclusions of the two independent neurosurgeons. It also enclosed copies of the full independent medical reports. The Fund's decision to deny benefits has rational support in the record. The decision was reasonable in light of Plan documents and was therefore not arbitrary and capricious. *See Brehmer*, 114 F.3d at 660; *see also Edwards v. Briggs & Stratton Ret. Plan*, 639 F.3d 355, 360 (7th Cir. 2001).[5]

Because the Fund's denial of benefits was not arbitrary and capricious, we conclude that the district court's grant of summary judgment for the Fund on the Estate's denial of

---

[5] We note that a portion of *Edwards* was superseded by regulation as stated in *Fessenden v. Reliance Standard Life Ins. Co.*, 927 F.3d 998 (7th Cir. 2019), but this is irrelevant to the matter before us.

benefits claim was appropriate. And, since we have identified no error in the denial of benefits, the Estate's request in the alternative for remand to the Fund for further review is also denied.

### B. The Estate's Claim for Equitable Relief

The Estate next contends that the district court erred in granting summary judgment on its equitable relief claim under 29 U.S.C. § 1132(a)(3) because the Fund violated ERISA by (1) failing to provide a detailed description of cost-sharing provisions for out-of-network benefits claims and (2) because the Summary Plan Description (SPD) did not adequately define emergency treatment. Section 1132(a)(3) allows participants to bring an action to enjoin "any act or practice which violates any provision of this subchapter or the terms of the plan," or to obtain "other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan."

The Estate alleges that the SPD does not adequately describe its cost-sharing provisions that apply to out-of-network services—in other words, the Estate contends that Plan participants who receive out-of-network care are left guessing as to how much they may be liable to pay under the Plan's cost-sharing provisions. Because, like the district court, we conclude that the Fund properly denied out-of-network benefits under the Plan—and therefore there was no cost-sharing allocation to determine under the Plan's terms—the Estate's first theory is moot.[6] Turning our attention to the second theory,

---

[6] We note that the Plan grants Trustees discretion to determine the "Usual, Customary, and Reasonable" amount for services or supplies that

the Estate argues that the SPD is deficient because it does not adequately define the term "emergency." As such, the Estate contends that Gifford reasonably believed his symptoms constituted an "emergency," as plainly understood, and therefore thought that his services would be covered under the Plan. It argues that Gifford should not have been required to "put off" what he was told was "required emergency surgery" in order to find an in-network provider or to get pre-approval for the out-of-network procedure. As an initial matter, we agree with the district court that while the Estate frames this as a separate claim, its remaining claim for equitable relief is really a repackaging of its denial for benefits claim under § 1132(a)(1)(B).

The problem with the Estate's argument is that the Plan unambiguously grants the Trustees discretionary authority to interpret and apply the terms of the Plan. Specifically, the Plan provides that Trustees or their delegates "have broad discretion … to interpret Plan language" and that "their decisions will be accorded judicial deference in any subsequent action at a court or administrative proceeding." Accordingly, we defer to the Trustees' interpretation of the Plan unless it is arbitrary and capricious. *Bator v. Dist. Council 4*, 972 F.3d 924, 929 (7th Cir. 2020).

Here, it was not. The Trustees' interpretation fell "within the range of reasonable interpretations" and was generally "compatible with the language and the structure of the [P]lan." *Id.* at 929 (internal citations omitted). The Plan unambiguously states that participants "**must** get [their] medical

---

the Fund will cover, including those administered by out-of-network providers.

care from providers who participate in the Anthem medical PPO network" and that "[o]nly a few exceptions apply for coverage of Out-of-Network providers." (emphasis in original). While the SPD provides that out-of-network services are covered in the event of an emergency, it also recognizes that such services "are still subject to all other Plan limits and exclusions," including "Medical Necessity." Recall that "Medical Necessity" for inpatient hospital care requires that the illness or injury "cannot be provided safely on an outpatient basis" and means that a specific service is "required to treat [the] condition."

As explained above, the Trustees' interpretation of "emergency," as well as their application of "Medical Necessity," were reasonably derived from not only the Plan's terms and the Trustees' analysis of Gifford's hospital records, but also two independent medical reviewers' conclusions—reviewers explicitly authorized by the Trustees to interpret the Plan. One reviewer concluded the aneurysm "could have been addressed in the following weeks on an outpatient basis"—a course of action that would not, under any reasonable interpretation, constitute a need for immediate treatment.

The Estate essentially seeks to supplant the Trustees' interpretation of "emergency" or "Medical Necessity" with that of Dr. Ahuja's (which, again, was absent from the administrative record). But the Plan does not provide that a single treating physician dictates the Plan's terms, and the Estate provides no authority for its belief that a treating provider's opinion is dispositive. In fact, the Plan's language suggests the opposite—a service or supply "**is not** automatically considered Medically Necessary just because it is prescribed by a Physician or other medical provider." (emphasis in original). And

the Estate's position is at odds with this Court's and the Supreme Court's precedent. *See, e.g.*, *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003) ("[C]ourts have no warrant to require administrators automatically to accord special weight to the opinions of a claimant's physician; nor may courts impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation."); *Leger v. Trib. Co. Long Term Disability Ben. Plan*, 557 F.3d 823, 832 (7th Cir. 2009) (discussing how "the Supreme Court has rejected the argument that the opinions of treating physicians deserve special consideration in benefits determinations"). In any event, even if we credit Dr. Ahuja's interpretation as a reasonable one, if two reasonable interpretations exist, we defer to the Trustees' interpretation. *Bator*, 972 F.3d at 930–31. We conclude that the district court properly granted summary judgment to the Fund on the Estate's claim for equitable relief.

We take a moment to stress what *could* have happened in this case. The Plan could have contained a common-sense provision stating that a treating physician's belief that a plan participant requires emergency services is due significant weight or creates a rebuttable presumption in favor of granting benefits. What's more, Congress could have legislated to require such a provision. But that is not the language of the Plan, and neither ERISA nor judicial precedent relied upon by the Estate establishes such a rule. Patients and family members are instead faced with a gut-wrenching Hobbesian choice of mulling over dense plan provisions or scheduling services in accordance with a treating physician's concern that delay would be catastrophic.

### C. Grant of Protective Order

Finally, the Estate argues that the district court erred in granting the Fund's motion for a protective order. The motion sought to prohibit the Estate from taking discovery outside of the administrative record, including taking the depositions of two Trustees. We review the district court's decision to grant the Fund's motion for abuse of discretion. *See Walsh v. Alight Sols. LLC*, 44 F.4th 716, 727 (7th Cir. 2022) ("The trial court is in the best position to weigh fairly the competing needs and interests of parties affected by discovery.") (internal citation omitted); *see also Geiger v. Aetna Life Ins. Co.*, 845 F.3d 357, 364 (7th Cir. 2017).

Discovery is normally disfavored in ERISA denial of benefits cases. *See Semien v. Life Ins. Co. of N. Am.*, 436 F.3d 805, 814 (7th Cir. 2006). The Estate alleges that a potential conflict of interest exists sufficient to allow discovery beyond the administrative record. A conflict of interest exists when "a plan administrator has both the discretionary authority to determine eligibility for benefits and the obligation to pay benefits when due." *Geiger*, 845 F.3d at 364–65 (cleaned up). In *Semien v. Life Insurance Company of North America*, we held that discovery in a case challenging a plan administrator's benefits determination is permissible only in "exceptional" circumstances when the claimant can "identify a specific conflict of interest or instance of misconduct" and "make a prima facie showing that there is good cause to believe limited discovery will reveal a procedural defect." 436 F.3d at 815.

Following the Supreme Court's decision in *Metropolitan Life Insurance Company v. Glenn*, 554 U.S. 106 (2008), however, we recognized "a softening, but not a rejection, of the standard announced in *Semien*." *Dennison v. MONY Life Ret. Income*

*Sec. Plan for Emps.*, 710 F.3d 741, 747 (7th Cir. 2013). "[C]on-flicts are but one factor among many that a reviewing judge must take into account." *Glenn*, 554 U.S. at 116. We have inter-preted *Glenn* to mean that the "*likelihood* that the conflict of interest influenced the [plan administrator's] decision" is key. *Dennison*, 710 F.3d at 746–47 (benefits review officers should not be subjected to extensive discovery on thinly based suspi-cions that their decision was tainted by conflict of interest) (emphasis in original). "It is thus not the existence of a conflict of interest—which is a given in almost all ERISA cases—but the *gravity* of the conflict, as inferred from the circumstances, that is critical." *Marrs v. Motorola, Inc.*, 577 F.3d 783, 789 (7th Cir. 2009) (emphasis in original). Without a doubt, post-*Glenn*, trial courts still "retain broad discretion to limit and manage discovery" under Federal Rule of Civil Procedure 26. *Den-nison*, 710 F.3d at 747.

Here, the district court did not abuse its discretion in granting the Fund's motion for a protective order. It first rec-ognized that there was reason to doubt that this case presents the same structural conflict of interest identified in *Glenn*. In contrast to cases involving a single-employer plan in which the employer or insurer has both discretion to determine eli-gibility of benefits and pays benefits when due, the Plan here is a multi-employer plan administered by a Board of Trustees, which is composed of an equal number of union and manage-ment representatives. Those Trustees voted unanimously to deny Suzanne Gifford's appeal. As in *Marrs*, there is no indi-cation from the record that the Board of Trustees "labored un-der a conflict of interest serious enough to influence [its] deci-sion consciously or unconsciously—a decision that was oth-erwise entirely reasonable." *Marrs*, 577 F.3d at 789; *see also Manny v. Cent. States, Se. & Sw. Areas Pension & Health &*

*Welfare Funds*, 388 F.3d 241, 243 (7th Cir. 2004) (no conflict of interest where multi-employer plan with equal number of employer and union representatives on appeals committee ruled unanimously and lacked incentive to rule against claimant).

Aside from this structure, the Board of Trustees also utilized independent medical reviewers to examine the record on appeal. *See Raybourne v. Cigna Life Ins. Co. of New York*, 700 F.3d 1076, 1082 (7th Cir. 2012) (active steps can be taken to "reduce potential bias and to promote accuracy"). While the Estate asserts that there is a conflict of interest between the independent medical review firms and the Fund, this allegation has no support in the record. Contrary to the Estate's allegations, both independent medical reviewers represented that they do not accept compensation for reviews dependent upon a particular outcome and certified in their reports that they had no "material, familial, or financial conflict of interest" with the referring entity, the health plan, the plan administrator, or the plan fiduciary or employees, among others.

This is not a borderline case—the Trustees' denial decision has "rational support in the record" and the district court was free to exercise its discretion in limiting discovery to the administrative record. *See Rabinak v. United Bhd. of Carpenters Pension Fund*, 832 F.3d 750, 755 (7th Cir. 2016). Likewise, the Estate presents no evidence of misconduct that might justify discovery outside of that record. *See Semien*, 436 F.3d at 815. The district court thus appropriately exercised its discretion in denying discovery outside of the administrative record and granting the Fund's motion for a protective order.

### III. Conclusion

Finding no error in the district court's grant of summary judgment for the Fund and grant of the Fund's motion for a protective order, we affirm.